

FILED

Dec 20 2024, 9:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Nakeyah Shields,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

December 20, 2024

Court of Appeals Case No.
23A-CR-1653

Appeal from the Marion Superior Court

The Honorable Shatrese Flowers, Judge

Trial Court Cause No.
49D28-2106-MR-18450

---

**Opinion by Judge Kenworthy**
Judges May and Vaidik concur.

**Kenworthy, Judge.**

## Case Summary

[1] In May 2020, George Floyd died while in Minneapolis police custody. In the following days, there were protests and demonstrations around the country, including in downtown Indianapolis. On Saturday, May 30, what began as peaceful protests turned violent and destructive as night fell. Between 11:20 p.m. and 11:40 p.m., several crimes were committed within a two-block area north and east of Monument Circle.[1] The State charged Nakeyah Shields, Marcus Anderson, and Alijah Jones with the crimes. The three defendants had a joint jury trial.

[2] The jury found Shields guilty of felony murder,[2] six counts of Level 3 felony armed robbery,[3] and one count of Level 3 felony attempted armed robbery.[4] The trial court ordered Shields to serve an aggregate sentence of 108 years. Shields appeals her convictions and sentence, raising the following reordered issues:

---

[1] The majority of the crimes occurred in the 400 block of Talbott Street. Talbott Street runs north-south between Pennsylvania and Delaware Streets. The 400 block is north of Vermont Street and south of Michigan Street.

[2] I.C. § 35-42-1-1(2) (2018).

[3] I.C. § 35-42-5-1(a)(1) (2017).

[4] I.C. §§ 35-42-5-1(a)(1) and 35-41-5-1 (2014).

(1) Did the trial court err in allowing the State to add a count of robbery days before the jury trial began?

(2) Did the trial court commit fundamental error by failing to admonish the jurors when they broke for lunch after their selection but before opening arguments?

(3) Did the trial court err in admitting social media evidence?

(4) Did the trial court err when it denied a request for surrebuttal closing argument?

(5) Did the cumulative effect of the errors deny Shields a fair trial?

(6) Was there sufficient evidence to support Shields' convictions?

(7) Is Shields' sentence of 108 years inappropriate when considering the nature of her crimes and her character?

[3]     We affirm.

## Facts and Procedural History

### The Crimes[5]

[4] Shields, Anderson, and Jones were with Dorian Murrell and another man[6] downtown the night of May 30. Murrell was Shields' boyfriend and Jones' brother. Shields, Anderson, and Murrell arrived together in Murrell's car and parked near Vermont and Talbott Streets. A car matching the description of Jones' car was also parked near Vermont and Talbott Streets that night. Shields' and Anderson's cell phones were used in that general area between 11 p.m. and midnight.

[5] Around 11:20 p.m., Amy Zandy parked on the first floor of a parking garage at Vermont and Delaware Streets adjacent to her apartment building. While Zandy was still in her car, she saw several people walk into the garage. One was a woman wearing a brightly colored jacket who Zandy felt "was with that group but was a little bit removed . . . when they were pretty much around my car." *Tr. Vol. 5* at 194. A man in a ski mask holding a gun knocked on the driver's window and told Zandy to give him her keys. When Zandy opened the driver's side door to comply, all the doors unlocked. Several people reached into the car.

---

[5] For a more detailed recitation of the crimes, see the opinion in Jones' separate appeal, also handed down on this date. *Jones v. State*, Cause No. 23A-CR-1644 (Ind. Ct. App. December 20, 2024); *see also Anderson v. State*, Cause No. 23A-CR-1645 (Ind. Ct. App. December 20, 2024).

[6] The State alleged this fifth person was involved in the crimes but was not able to identify him.

[6] One man entered the front passenger side and pulled Zandy down onto the center console by the collar of her shirt and held her there. The man with the gun repeated his demand for her keys. Zandy told them where the keys were. Most of the group left, taking Zandy's cellphone, wallet, and makeup bag, but leaving her keys. The man in the passenger seat remained for a few more moments and then also left the car. The group walked north on Delaware Street from the parking garage toward Michigan Street. Zandy left the parking garage to drive to a friend's house and waved down a police officer about a block away from the garage to make a brief report. He took her name and number and sent her on her way, telling her to be safe.

[7] Kimberly Eggers went to Monument Circle to meet up with her friends but when she could not find them, she left the area because it was "pretty crazy" and she felt she "should probably get out of [t]here[.]" *Tr. Vol. 4* at 28–29. She started walking north and called a friend to come pick her up. On Michigan Street between Pennsylvania and Delaware Streets, Eggers turned around when she heard someone behind her say, "[H]ey." *Id.* at 32. Four men Eggers did not know surrounded her and one hit her in the face. One man took her cellphone out of her hand, and another took her backpack. A man with dreadlocks hit her again and she fell to the ground, losing her glasses. The men kicked her several times before walking west on Michigan Street. As Eggers watched them walk away, she saw a man on a bike and a person wearing a "bright jacket" at the corner. *Id.* at 35. Eggers called out, asking for her things to be returned. The man with the dreadlocks turned around, and Eggers saw

what she thought was a crowbar in his hand. She found her glasses in the street and ran the other way. Surveillance cameras from a nearby building captured video of the robbery, which occurred around 11:30 p.m. The video also captured a person in a brightly colored jacket nearby.

[8] Sofia Fuentes and Saige Mitchell were downtown and decided to leave when they "started to see things getting broken into." *Id.* at 209. Fuentes was live streaming on Instagram while they tried to find their way back to their car. Fuentes and Mitchell passed near Zandy's parking garage. They heard gunshots, which can also be heard on the video. Now "freak[ed] out," they headed in another direction and ended up on Vermont Street near Talbott Street. *Id.* at 210.

[9] Around this same time, Jared Sarr arrived downtown and parked in a lot on Talbott Street behind an apartment building to visit a friend. Byron Morris, Alejandro Thompson, and Abbey Bell were with him. Thompson noticed four men approaching at the same time Sarr shouted at everyone to run.

[10] Sarr ran into the apartment building, but the men caught up with Morris, Thompson, and Bell. The men pushed them to the ground and told them to empty their pockets. Two men started kicking Thompson while another man struggled with Bell over her cellphone. The man—who Bell said was wearing all black and a ski mask—told Bell to input her Apple ID. When Bell could not remember it, the man fired a shot into the ground near her. Morris was also being yelled at to enter his Apple ID into his phone. Morris recalled one of the

men wearing a COVID-style facemask, a red baseball cap, and a black sweatshirt; a second man had dreadlocks and was wearing a facemask and a white t-shirt. Bell and Morris saw two firearms among the men.[7]

[11] Fuentes and Mitchell "stumbled upon a robbery going on" on Talbott Street. *Id.* at 210. They saw three or four masked men standing over several people on the ground. One of the men—who was wearing a white shirt and had dreadlocks—yelled to Fuentes and Mitchell to get down and waved a gun toward the ground. While Fuentes and Mitchell were on the ground, the men went through their pockets, and someone fired a shot near Mitchell's head. The men ran north toward Michigan Street when they saw police lights in the distance. Bell grabbed her cell phone back as the men started running, but the men took Morris' cellphone, wallet, and electric cigarette vape; Thompson's cellphone and wallet; and Fuentes' backpack with Mitchell's car keys in it. They did not take anything from Mitchell personally. Morris estimated the robbery lasted three to five minutes.

[12] Sarr came out of the apartment building and motioned for his friends to come inside. Fuentes and Mitchell ran south onto Vermont Street and heard two or three gunshots in the area they had come from. Sarr, Morris, and Bell also heard gunshots shortly after entering the apartment building.

---

[7] Thompson did not testify at trial.

[13] Soon after hearing the gunshots, Fuentes and Mitchell saw an ambulance and police cars head toward Talbott Street and decided to go back and tell police about their robbery, thinking it "might be a part of whatever had just happened." *Id.* at 217. They returned to Talbott Street "[m]aybe seven minutes" after they left and saw someone face down on the ground who had not been there before. *Id.* at 218.

[14] At 11:36 p.m., Christopher Beaty left his apartment building at the corner of Delaware and Vermont Streets through the Delaware Street entrance and turned right, walking toward Vermont Street. He was holding his cellphone in his hand. Shields was standing at the end of Talbott Street as Beaty walked by on Vermont Street. Shields commented about the blunt Beaty was smoking and he told her to be safe "because it's crazy out." *Tr. Vol. 6* at 9. Shortly after that interaction, Shields heard gunshots and ran. The body Fuentes and Mitchell saw lying face down when they returned to Talbott Street was Beaty's. He had been shot multiple times.

[15] Kiran Sunkara was downtown to check on his office. He parked in the 400 block of Talbott Street facing north with Vermont Street immediately behind. He left the office about 11:10 p.m., went to his car to leave his backpack, and then walked to a nearby mailbox to mail a check. The walk to the mailbox from his car took seven to ten minutes. Sunkara returned to his car, buckled up, and locked his doors. Within seconds, two men approached his car from behind. A man wearing a dark-colored shirt approached the driver's side and told Sunkara to get out. Another man wearing a light-colored shirt approached

the passenger side and tapped a gun on the windshield. Sunkara reversed his car quickly onto Vermont Street and drove away. As he was reversing, a shot was fired at his car. He did not see anyone else in the alley during this incident.

## The Investigation

[16] Detective Stephen Smalley of the Indianapolis Metropolitan Police Department ("IMPD") responded to the call of a person down in the 400 block of Talbott Street at about 11:40 p.m. Beaty was face down on the street with his head pointed south. No surveillance cameras covered this block and there were no eyewitnesses to the shooting. Fuentes, Mitchell, Morris, Thompson, and Bell had remained nearby and spoke with investigators at the scene.

[17] Crime scene specialist Kaylee Schellhaass responded to the scene in the early morning hours of May 31. Schellhaass collected two bullet casings from the street and found Beaty's iPhone to the north of his body. Bell provided her cell phone for testing because one of the perpetrators had grabbed it. Schellhaass collected swabs from Beaty's and Bell's phones. When the swabs were later tested for DNA, Anderson, Jones, Shields, and Murrell were excluded as contributors of DNA recovered from the phones.[8] Schellhaass returned to the 400 block of Talbott Street on June 1 and collected three additional casings a passerby had found in the shrubs along the street.

---

[8] As will be discussed later, video of the Zandy robbery showed all the perpetrators wearing surgical gloves during that event.

[18]    A little over two hours after Beaty's body was found, Murrell was shot at Monument Circle in an unrelated incident. Shields, Anderson, and Jones were with Murrell when he was shot. Murrell was taken to Eskenazi Hospital where he died from his injuries. Detectives investigating the Murrell shooting spoke with Jones at the hospital and noticed a man wearing a brightly colored jacket who identified himself as "Marcus."

[19]    On the afternoon of May 31, David Munoz contacted police. His car had been parked since midday May 30 on the first floor of the same garage where Zandy was robbed. When he returned to his car on May 31, the driver's side window was shattered. Munoz started to clean his car but stopped because he found a bullet in the debris. Officers recovered the bullet and a casing from the car. On June 1, Sunkara contacted police after reading about Beaty's death. Police recovered a bullet from the passenger-side engine compartment of Sunkara's car.

[20]    Dr. Christopher Poulos, chief forensic pathologist at the Marion County Coroner's Office, examined Beaty's body. He identified four gunshot wounds to the back of Beaty's body and recovered bullets from two of the wounds. He also found evidence of blunt force injuries. Dr. Poulos said these injuries "could be explained by a fall after being shot" but believed it was "more probable than not that they were the result of a physical altercation[.]" *Tr. Vol. 4* at 23–24. He explained, "[W]hen we have a fall . . . I expect to see [injuries] in one plane, [but] in this case, we have more than one area." *Id.* at 24. Dr. Poulos determined Beaty's manner of death was homicide.

[21] Timothy Spears, a forensic firearms examiner, examined the six casings (five from Talbott Street and one from Munoz's car) and four bullets (two from Beaty's body, one from Munoz's car, and one from Sunkara's car) recovered during the investigation. Detective Spears determined all the casings came from the same firearm and all the bullets came from the same firearm. A firearm associated with these crimes was never recovered. Without a firearm for comparison, Detective Spears could not conclusively say the casings *and* bullets all came from the same firearm.

[22] Detective Ted Brink was assigned to investigate the Zandy robbery. Detective Brink spoke with Zandy on June 1, and later obtained high-quality surveillance video from the parking garage. The video shows five people—a woman and four men—walking into the parking garage. They are all wearing surgical gloves and the four men are wearing some sort of face covering. The woman—later identified as Shields—is wearing a jacket with bright red, yellow, blue, and green blocks of color. One man—later identified as Murrell—is wearing a red baseball hat and Tommy Hilfiger sweatshirt; another man—later identified as Anderson—has shoulder-length dreadlocks and is wearing jeans and a white t-shirt. Those two men are wearing medical face masks. Another man—later identified as Jones—is wearing a dark long-sleeved shirt, black pants with white stripes down the side, black shoes with a white sole, and a ski mask. The fifth unidentified person is wearing a Champion sweatshirt and has something wrapped around the bottom half of his face.

[23]     As they enter, some of the men try door handles on the cars they pass. Shields pulls her hood up and cinches the drawstring as she looks around the garage. She walks in front of three parked cars and then passes diagonally through the empty space on the driver's side of Zandy's car. Shields is within a few feet of Zandy's car as she walks through that space, and she looks at the driver's side window, holding her hood close to her face. Murrell, at the back of the car, hands what looks like a gun to Jones. Shields continues toward the back of the car, walking past Jones and Murrell as they walk toward the driver's door. Shields appears to say something to Jones and Murrell (the video has no sound) and "smirk[s]" as she walks out of the frame. *Tr. Vol. 8* at 86. Jones knocks on the driver's side window and shows a gun. Murrell opens the driver's door, leans into the car, and pulls items out; Jones opens the driver's side rear door and pulls more items out. Anderson enters the front passenger side of the car and stays for forty-five seconds.

[24]     After comparing the Zandy robbery video to reports, pictures, and videos from other crimes and events that occurred on May 30, Detective Brink contacted Detective Smalley to say he believed their investigations were related.

[25]     IMPD created "be-on-the-lookout" fliers ("BOLOs") containing still photos taken from the video, information about the time and date of the crime, and contact information. The BOLOs were released to the media on June 4. Several people contacted IMPD after seeing the BOLOs. Among them, Fuentes and Morris each told Detective Smalley the suspects depicted were the same people who robbed them on Talbott Street. Eggers also saw the BOLOs

and recognized the individuals depicted as the men who attacked her, but she did not immediately report the crime against her. Latanya Lewis—who had known Jones since he was in junior high school—saw the BOLOs and reported Jones as one of the suspects. Officers investigating Murrell's death recognized the clothing on one of the suspects as matching what Murrell was wearing at the time he was shot.

[26] Using the Zandy robbery video, surveillance video from various other buildings around the area, Fuentes' livestream video, and tips from the BOLOs, among other things, Detective Smalley identified four of the suspects as Shields, Anderson, Jones, and Murrell and followed their movements around Vermont and Talbott Streets leading up to and following the Zandy robbery. The group was together when they robbed Zandy; they could all be seen in video of the Eggers robbery; shortly after Beaty was shot, they are seen together again, and they were together two hours later when Murrell was shot. Detectives then gathered additional evidence, including video of cars matching the description of Murrell's and Jones' cars parked near Vermont and Talbott Streets during the incidents, the subjects' cell phone location data, and articles of clothing collected during a search of Jones' apartment. Zandy identified Anderson as the person in the passenger seat who held her down during the robbery from a photo array Detective Brink presented to her.

[27] Detective Smalley searched the suspects' social media accounts and got a search warrant for records from their Facebook accounts. His review of those records revealed several private message conversations seemingly discussing the

crimes. On June 2, 2020, Anderson sent Jones a message asking if he could stay with him and get rides to and from work. Jones replied, "That ain't no good idea you need to be hiding out and sh*t from the other night . . . . Aye you need to lay low get out of town or something I just seen the report from that dude. . . . Ima send it to you but you gotta delete our whole message thread and all that sh*t." *Ex. Vol.* 1 at 193–94. Anderson asked, "What dude," and Jones replied, "N**** from the alley." *Id.* at 194. On June 4, Anderson sent Shields a message stating, "Aye somebody wanna buy that gun. Ask bro do he wanna sell it." *Id.* at 190. Shields responded, "Don't talk like that on my phone. . . . I don't know what you talking about." *Id.* Anderson replied, "My bad u right." *Id.* On June 5, Jones sent Shields a message saying, "Yea I'm straight just staying out the way especially cause of you know what so I really ain't been out." *Id*. at 183. On June 10, Anderson sent a message to an individual named Sanders stating, "I need to move down there. Tbh I'm in a lil trouble up here and I def need to get tf lost." *Id.* at 198. They also shared screenshots of the BOLOs and a social media post and news stories about Beaty's murder with each other.

[28] Shields and Anderson both spoke with Detective Smalley. Both admitted being downtown on May 30 in the company of Murrell. Shields said she was "at the end of the alley where Chris Beaty was murdered . . . standing there by a car talking to [Murrell]." *Tr. Vol. 6* at 9. Beaty walked by, smoking a blunt. Shields commented the blunt "seemed nice" and Beaty told her to "be safe out tonight because it's crazy out." *Id*. Shortly after, Shields heard a gunshot and

ran. Anderson said he walked through a parking garage and "interacted with someone" that night. *Id.* at 12. Shields and Anderson were unable to leave downtown because the location where their car was parked was "blocked off by police and crime scene tech." *Id.* at 10. They were both with Murrell when he was shot and went to the hospital to be with him.

**Pretrial Proceedings**

[29] In June 2021, a grand jury indicted Shields for felony murder (for killing Beaty while committing or attempting to commit robbery), five counts of armed robbery (for allegedly taking property from Morris, Thompson, Bell, Fuentes, and Zandy), and one count of attempted armed robbery (for allegedly attempting to take property from Mitchell).[9]

[30] At the time of the grand jury proceedings, the State knew about the Eggers robbery because it could be seen on surveillance video but did not know Eggers' identity. In the summer of 2022, Eggers contacted police to report she had been robbed on May 30, 2020. Shields took Eggers' deposition in the fall of 2022. On May 9, 2023—two weeks before trial—the State moved to amend Shields'

---

[9] A grand jury also indicted Jones for felony murder, four counts of armed robbery, and two counts of attempted armed robbery. The four counts of armed robbery alleged Jones took property from Morris, Thompson, Bell, and Fuentes. The attempted robbery counts alleged Jones attempted to take property from Mitchell and Sunkara. Jones was separately charged in August 2020 with counts related to the Zandy robbery.

Anderson was charged by information in August 2020 with counts related to the Zandy robbery and in December 2020 with murder, felony murder, four counts of armed robbery (for allegedly taking property from Morris, Thompson, Bell, and Fuentes), two counts of attempted armed robbery (for allegedly attempting to take property from Mitchell and Sunkara), and one count of pointing a firearm at Thompson.

charges to add a count of Level 3 felony robbery related to the Eggers robbery (the "Eggers count"). One week later, Shields filed a motion in limine seeking to exclude, among other things, "any mention of a robbery of Kimberly Eggers on May 30, 2020[.]" *Appellant's App. Vol. 2* at 94.

[31] On May 18, the trial court held a final pretrial conference to address outstanding motions, including the motion to amend the charges against Shields. Shields objected to the amendment as "problematic" due to the late date, information garnered during Eggers' deposition, and the possibility the State was adding a charge to "put pressure on" Shields. *Tr. Vol. 2* at 118, 120. The trial court granted the motion and allowed the State to add the Eggers count.[10] Shields did not request a continuance.

**The Trial**

[32] The joint jury trial began with jury selection on the morning of May 22, 2023. After a jury was selected, the trial court administered the oath to the jurors and then took a break for lunch. The trial court informed the jury of food options in the area and set a time for them to return. Then the court let them leave the courtroom on their own without giving them an admonishment not to talk among themselves or with others during the break or form or express an opinion about the case. Shields did not object to the lack of admonishment.

---

[10] The State also moved to amend Anderson's and Jones' charges to add counts related to the Zandy and Eggers robberies. The trial court allowed those amendments, and the State dismissed Anderson's and Jones' separate cases.

When court resumed, the trial court immediately gave them preliminary instructions, beginning with the following:

> Members of the jury, you have been selected as jurors and you are bound by your oath to try this case fairly and honestly.
>
> You are permitted to discuss the evidence among yourselves in the jury room during recesses from trial but only when all jurors and alternates are present.
>
> You must not talk or communicate about this case with anyone else.
>
> You should keep an open mind.
>
> You should not form or express any conclusion or judgment about the outcome of the case until the Court submits the case to you for your deliberations.
>
> * * *
>
> If anyone tries to talk about the case in your presence, you should tell the bailiff immediately and privately.

*Tr. Vol. 3* at 170–71.

[33] The State called more than twenty witnesses and introduced more than 150 exhibits during the four-day trial. The exhibits included certified business records from Facebook of communications involving Shields, Anderson, and Jones. Detective Smalley explained the process of filing a preservation request, obtaining a search warrant, and reviewing the records produced. When the

State offered Shields' Facebook records, Shields objected, claiming the records had not been sufficiently authenticated. The State intended to introduce a set of Facebook records for each defendant, and the trial court heard all defendants' objections at one time. The trial court admitted the records over objection.

[34] The information alleging felony murder did not identify the property that was allegedly taken from Beaty, nor did the State elicit specific testimony during trial about it. After the State's initial closing argument, Anderson argued even though Beaty's cell phone was found away from his body, there was no evidence the phone or any other property was taken from him and there was no evidence anyone struggled with him. Jones claimed the other victims may have been robbed, but Beaty had just been killed. And Shields argued there was "no evidence whatsoever" that Beaty was robbed. *Tr. Vol. 7* at 139.

[35] In rebuttal, the State argued:

> [W]e know that [Beaty] got to the end of [Talbott Street] because you can see where his phone is. His phone is lying on the ground, almost to the exact location where we know [Bell, Morris, Mitchell, Fuentes, and Thompson] were being robbed. Something happened that that phone is not in his hands anymore.
>
> Every victim of the robbery at the end of [Talbott Street] said that they were trying to take their phones, standing over them, making them enter their passwords, trying to get into the phone.
>
> The phone is at the end of [Talbott Street] and . . . Beaty has, as Dr. Poulos testified, injuries that are more likely to have come from an altercation than simply falling on the ground.

> You saw the photos of [Beaty]. He did not just fall on the ground. And he's not found by his phone. He had turned and he had run. And he was shot four times, four times in the back of his body.

*Id.* at 149–50. When the State concluded its rebuttal, Jones' counsel asked for surrebuttal under Indiana Jury Rule 27. Counsel asserted the State's rebuttal argument that someone tried to take Beaty's phone and "its distance from his body was evidence that a robbery occurred" was not an argument the State advanced in its initial closing argument. *Id.* at 156. The trial court denied the request for surrebuttal but allowed Jones' counsel to make a record on the request, in which Shields' counsel joined.

[36]     The trial court gave final instructions to the jury about accomplice liability, including that a person "does not have to personally participate in the crime" or "be present when the crime is committed" and proof of the defendant's "failure to oppose the commission of a crime, companionship with the person committing the offense, and conduct before and after the offense may be considered in determining whether aiding may be inferred." *Id.* at 159.

[37]     The jury found Shields guilty of all charges.[11]

---

[11] Anderson and Jones were each convicted of felony murder, six counts of Level 3 felony armed robbery (Morris, Thompson, Bell, Fuentes, Zandy, and Eggers), and two counts of Level 3 felony attempted armed robbery (Mitchell and Sunkara). The trial court granted judgment on the evidence on Anderson's pointing a firearm charge. Anderson and Jones were each sentenced to 164 years.

**Sentencing**

[38] The presentence investigation report prepared for Shields' sentencing reflects she was nineteen years old on May 30, 2020. She successfully participated in an informal adjustment for one incident as a juvenile and had no arrests or convictions as an adult before the current offense. She had several disciplinary incidents while incarcerated awaiting trial. Her risk of reoffending was low. Shields filed a sentencing memorandum with the trial court, identifying the following mitigating factors: lack of criminal history; her character and attitudes convey she is unlikely to commit another crime; lengthy imprisonment will be an undue hardship on her young son; and she has post-traumatic stress disorder ("PTSD"), anxiety, and depression.

[39] Eggers testified at the sentencing hearing, explaining the significant impact the incident had on her, but also expressing her forgiveness and requesting a fair "yet not harsh" sentence. *Tr. Vol. 8* at 18. Two of Beaty's friends and his sister testified about Beaty and the impact of his life and death. Other friends of Beaty's sent letters to the trial court.

[40] Several people spoke on Shields' behalf and others sent letters to the court. Shields spoke in allocution, offering her apologies "to the families, and also to [her] family for the pain, hurt, and trauma that this situation has caused." *Id.* at 56. She stated she "accept[s] the sentence that will be given," but asked for mercy:

> May you all please take into consideration that this is my first
> time ever being incarcerated, that I am a mother of a three-year-

old handsome young boy, I am a high school graduate, and that I was at the wrong place at the wrong time.

*Id.* at 57.

[41] Shields' counsel highlighted the testimony from the trial: "[O]ne of the biggest things that we lean on is every single witness said Nakeyah Shields was not involved. No female was involved. It was four males." *Id.* at 78–79. Counsel also emphasized the support Shields has from her family, especially her mother, who is now raising Shields' child. She asked for alternative sentencing—house arrest, work release, and/or probation—and for a sentence of forty-five years, the "lowest possible concurrent sentence that she could have." *Id.* at 80. The State noted the nature and circumstances of the crimes were an aggravator and acknowledged as mitigators that Shields had lived a law-abiding life before these offenses, and the undue hardship incarceration would cause to her child and mother. The State requested a sentence of 127 years—consecutive terms of 55 years for felony murder and nine years for each robbery.

[42] The trial court found the following mitigators: Shields is a high school graduate, a prolonged period of incarceration would be an undue hardship on her son, she has a recent mental health diagnosis, and she is a low risk to reoffend. The trial court found the nature and circumstances of the crimes—"crimes of violence with multiple victims"—were an aggravator. *Id.* at 86. The trial court rejected Shields' argument that she was in the wrong place at the wrong time, noting "there are videos throughout the entire night that you were still with the same group of people." *Id.* at 87. And the court related a conversation it had

with the jury after the verdicts in which the jury advised "they watched the [Zandy robbery] video over and over and over again, . . . and at one point you were smirking." *Id.* at 86. That said, the trial court believed a mitigated sentence was appropriate and sentenced Shields to fifty-two years for felony murder and eight years for each robbery and attempted robbery conviction. The court ordered the sentences to be served consecutively, for a total sentence of 108 years in the Department of Correction.

[43] Shields appeals her convictions and sentence. Additional facts will be added as necessary.

## 1. Shields waived any objection to amending the charges against her, but waiver notwithstanding, there was no error in allowing the amendment.

[44] Shields claims the trial court erred by granting the State's motion to amend the indictment to add the Eggers count. She claims the amendment affected her defense because it allowed the State to use evidence "not previously expected to be used" to argue the Eggers robbery was one encounter in a series of escalating incidents culminating in Beaty's murder. *Appellant's Br.* at 36.

[45] The State argues Shields' remedy for an allegedly prejudicial pretrial substantive amendment was a continuance. Because she did not ask for one, the State argues she waived this issue for appeal. Shields argues she was not required to request a continuance to preserve this issue, citing *State v. McFarland*, 134 N.E.3d 1027, 1032 n.6 (Ind. Ct. App. 2019), *trans. denied*.

[46]     *McFarland* did not directly address the effect of a defendant's failure to request a continuance, as the trial court in that case *denied* the State's requested amendment. *See id.* at 1029. The State argued on appeal the amendment should have been granted, in part because the trial court would have been obligated by statute to grant a continuance had the defendant requested one, so there would have been no prejudice to him. *See id.* at 1030 (citing Ind. Code § 35-34-1-5(d)). In a footnote, the *McFarland* panel recognized the difficult choice between requesting a continuance and bringing an end to litigation and stated it would not assume a continuance would have been in the defendant's best interests. *See id.* at 1032 n.6. *McFarland* was decided from a different procedural posture, and the panel did not say requesting a continuance would not be required to preserve the claim if the trial court had ruled the other way. A long line of cases holds the failure to request a continuance after the trial court allows a pre-trial substantive amendment to the charging information over defendant's objection results in waiver of the issue on appeal and *McFarland* does not—and could not—change that long-standing precedent. *See Riley v. State*, 506 N.E.2d 476 (Ind. 1987); *Wilson v. State*, 931 N.E.2d 914, 918 (Ind. Ct. App. 2010), *trans. denied*; *see also Culbertson v. State*, 929 N.E.2d 900, 906 (Ind. Ct. App. 2010) (reminding this court is bound by our Supreme Court's decisions), *trans. denied*. Shields did not request a continuance and has waived this issue for appellate review.

[47]     Waiver notwithstanding, Shields would not prevail. An amendment to the charging information may be either a matter of form or substance. *See Fajardo*

*v. State*, 859 N.E.2d 1201, 1203 (Ind. 2007). An amendment is one of substance "only if it is essential to making a valid charge of the crime." *Erkins v. State*, 13 N.E.3d 400, 406 (Ind. 2014) (quoting *Fajardo*, 859 N.E.2d at 1205). The amendment here "charges the commission of a separate crime [and] is unquestionably essential to making a valid charge of the crime[.]" *Fajardo*, 859 N.E.2d at 1208.

[48] An indictment or information may be amended in matters of substance "upon giving written notice to the defendant at any time . . . before the commencement of trial . . . if the amendment does not prejudice the substantial rights of the defendant." I.C. § 35-34-1-5(b)(2) (2014). A defendant's substantial rights "include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights." *Erkins*, 13 N.E.3d at 405 (quoting *Gomez v. State,* 907 N.E.2d 607, 611 (Ind. Ct. App. 2009), *trans. denied*). "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges." *Taylor v. State*, 86 N.E.3d 157, 163 (Ind. 2017) (quotation omitted), *cert. denied*.

[49] We review a trial court's decision on whether to permit an amendment to a charging information for an abuse of discretion. *Howard v. State*, 122 N.E.3d 1007, 1013 (Ind. Ct. App. 2019), *trans. denied*. An abuse of discretion occurs when the trial court's judgment is "clearly against the logic and effect of the facts and circumstances before it or is contrary to law." *Id.* (citation omitted).

[50]    Shields' substantial rights were not prejudiced by the amendment.  Shields had both notice and an opportunity to be heard.  At the time of the grand jury proceedings, the State knew about the Eggers robbery but did not know Eggers' identity.  When Eggers reported the crime to police in June 2022, the State promptly informed Shields.  Shields deposed Eggers in September 2022.  Shields was tried in May 2023.  Shields therefore had notice of the State's possible amendment for several months before the State formally moved to amend two weeks before trial.  Moreover, the State's amendment did not affect Shields' ability to argue or present evidence relevant to her defense that she did not participate in the crimes.  Shields' pre-amendment defense was equally applicable to the Eggers count.

[51]    Shields had a reasonable opportunity to prepare for and defend against the added count.  *See Mays v. State*, 120 N.E.3d 1070, 1080–81 (Ind. Ct. App. 2019) (amendment did not prejudice the defendant because he knew the amendment likely would occur long before it was formally requested and the amendment did not change his defense), *trans. denied*.  The trial court did not abuse its discretion in allowing the amendment.

## 2.  The trial court did not commit fundamental error in failing to give an admonishment to the jury about communication when outside the courtroom.

[52]    Trial court decisions on instructions and admonishments to the jury are reviewed for an abuse of discretion.  *Owen v. State*, 210 N.E.3d 256, 267 (Ind. 2023); *Gibson v. State*, 702 N.E.2d 707, 710 (Ind. 1998), *cert. denied*.

[53]     Indiana Code section 35-37-2-4(a) states:

> The court shall admonish the jurors in the preliminary
> instruction, before separating for meals, and at the end of the
> day, that it is their duty not to converse among themselves or
> permit others to converse with them on any subject connected
> with the trial, or to form or express any opinion about the case
> until the cause is finally submitted to them.

Failure to provide this admonishment, however, does not lead to automatic reversal. *Cardosi v. State*, 128 N.E.3d 1277, 1284–85 (Ind. 2019). Instead, a defendant must show he was "harmed by failure of the court to instruct or admonish the jury as to conduct during recess." *Id.* at 1285 (quoting *Brown v. State*, 201 N.E.2d 281, 283 (Ind. 1964)).

[54]     Here, the trial court seated the jury, administered the oath, and broke for lunch without giving an admonishment. For the first time on appeal, Shields argues the trial court erred by failing to admonish the jury before it separated for lunch. Although the "terms of the statute are mandatory in their call for an admonition of the jurors at specific times, no error is preserved for appeal where there was no objection interposed at the time of the action complained of." *Lake v. State*, 565 N.E.2d 332, 335 (Ind. 1991).

[55]     A claim that has been waived by failure to raise a contemporaneous objection can be reviewed on appeal if a fundamental error occurred. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Shields contends such an error occurred here.

[56]    The fundamental error exception to waiver is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). The appellant "faces the heavy burden of showing that the alleged errors are so prejudicial to [their] rights as to 'make a fair trial impossible.'" *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)). This exception is available only in "egregious circumstances." *Brown*, 929 N.E.2d at 207 (citation omitted).

[57]    We acknowledge the trial court did not strictly adhere to Indiana Code section 35-37-2-4 when it did not admonish the jury before breaking for lunch. But Shields has not shown that any harm or potential for harm was substantial, and we cannot conclude the court's failure amounts to fundamental error.

[58]    Shields claims an admonishment after the jury was selected and before it left the courtroom for the first time "was imperative here because the jury was unaware of the rules they were being governed by" and failure to inform the jury of those rules "*may* subject the defendant to great harm." *Appellant's Br.* at 43–44 (emphasis added). Shields speculates the jurors could have discussed the case with someone they called at lunch, or a subset of the jurors could have discussed the case among themselves as they returned to the jury room. *See id.* at 44. But Shields cites no evidence in the record of these communications occurring or of any juror making up their mind about the case during the break. She claims "there is no way to know for certain what occurred" and we should

not speculate that it did *not* occur. *Id.* But it is Shields' "heavy burden" to prove fundamental error. *Ryan*, 9 N.E.3d at 668.

[59] The jury was sworn by the trial court and took an oath to well and truly try the case and give a true verdict based on the law and the evidence. *See* I.C. § 34-36-3-6 (1998). At the time the court broke for lunch, the jurors had heard the list of charges against each defendant and the names of witnesses expected to testify, but there had been no argument or evidence. Court resumed slightly over an hour later, and the trial court immediately gave the jury preliminary instructions, including how, when, and with whom they could communicate about the case[12] and to inform the bailiff if anyone tried to speak with them about it. The preliminary instructions also informed the jurors of the necessity to keep an open mind, not form or express an opinion until after the case was submitted to them, and decide the case based only on the law and evidence admitted at trial. As Shields concedes, the trial court gave the appropriate admonishment every other time it was required. *See Appellant's Br.* at 43 (listing eleven times the admonishment was given).

---

[12] As our courts have noted, the content of the admonishment required by Section 35-37-2-4(a) and Jury Rule 20(a)(8) conflict as to intra-jury communications. *See Cruz Rivera v. State*, 127 N.E.3d 1256, 1258 n.1 (Ind. Ct. App. 2019) (noting Jury Rule 20(a)(8) requires judges to give jurors a preliminary instruction that they are "*permitted to discuss* the evidence among themselves in the jury room during recesses from trial when all are present, as long as they reserve judgment about the outcome of the case until deliberations commence" whereas Section 35-37-2-4(a) requires judges to admonish jurors "*not to converse* among themselves . . . on any subject connected with the trial . . . until the cause is finally submitted to them." (emphasis added)), *trans. denied*; *see also Cruz Rivera v. State*, 134 N.E.3d 386 (Ind. 2019) (David, J. dissenting from denial of transfer) (observing the statute requires an admonishment be given, but the content should reflect Jury Rule 20(a)(8)) (mem).

[60] Shields' speculative claim the jurors may have conversed among themselves or with others does not show a fair trial was impossible. Although we agree the trial court erred when it failed to provide the required admonishment, we cannot say the trial court committed fundamental error.

### 3. The trial court did not abuse its discretion in admitting Facebook messages.

[61] Shields claims the trial court erred by admitting private Facebook messenger conversations that were not properly authenticated. The State introduced three sets of exhibits: one set with messages obtained from Jones' account, one with messages from Anderson's account, and one with messages from Shields' account. Shields does not challenge the admission of Jones' records because those records "do not contain the same authentication problem" as she alleges hers and Anderson's do. *Appellant's Br.* at 22 n.13.

[62] Detective Smalley testified a "big part of the investigative process is social media research" when trying to identify suspects. *Tr. Vol. 7* at 34. He described searching suspects' names and known associates in "any available social media." *Id.* Detective Smalley first sent a preservation request to Facebook to "essentially freeze[] or save[] a version of the information on the account as it exi[s]ts in that moment in time." *Id.* He later submitted search warrants for the

Facebook accounts of Shields, Anderson, and Jones. Jones' and Anderson's records were requested in July 2020; Shields' were requested in August.[13]

[63] The warrant for Shields' Facebook records sought information "under Facebook case number 5203731" for the account identified by the following URL[14]: https://www.facebook.com/nakeyah.shields.1. *Ex. Vol. 3 at 63.* Facebook returned a Certificate of Authenticity of Domestic Records of Regularly Conducted Activity signed by the Custodian of Records and certifying it had received a warrant and was responding with records "for the account with identifier 100012326103170." *Ex. Vol. 1 at 187.* The warrant for Anderson's records sought information from the account identified by the following URL: https://www.facebook.com/marcus.y.anderson. This warrant also included a screenshot of Anderson's account homepage, including a photo. The Certificate of Authenticity certified Facebook had received a warrant and was providing records "for the account with the identifier 100001308246632." *Id.* at 192.[15]

---

[13] Shields notes in her Statement of Facts that the warrant for her records was requested on August 20, 2020, at 12:08 a.m. and issued at 2:19 a.m., but the certificate of authenticity from Facebook that accompanied the records returned pursuant to the warrant indicated the warrant was received on August 19, 2020. *See Appellant's Br.* at 14 (citing *Ex. Vol. 1 at 18, Ex. Vol. 3 at 50, 61*). Shields does not make any argument based on this discrepancy.

[14] "URL" stands for "Uniform Resource Locator," and is the address of a unique resource on the internet. *What is a URL?*, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/What_is_a_URL (last visited December 10, 2024) [https://perma.cc/76HH-F2W8].

[15] "Facebook assigns each user a unique number to the account." *Tr. Vol. 7 at 35.* To illustrate the basis for the objections to Anderson's and Shields' records, the warrant for Jones' records sought records from "https://www.facebook.com/profile.php?id=100008034708544." *Ex. Vol. 3 at 91.* The Certificate of

[64]   For each account, Facebook returned "a large amount of information[,] . . . really anything associated with the account." *Tr. Vol. 7* at 35. Detective Smalley reviewed the records and located messages he felt were relevant to the investigation. The State copied the pages containing those messages, redacted irrelevant messages, and offered them into evidence.

[65]   When the State offered the Facebook exhibits, the trial court held a hearing outside the presence of the jury at which all three defendants made their objections to "all the Facebook material [the State is] trying to enter." *Tr. Vol. 7* at 36.[16] Jones' counsel challenged the authentication of the evidence, specifically the "lack of proper identification between the certification and the warrant." *Id.* at 37. Anderson's counsel objected to his records because there was no identifier number referenced in the search warrant for Anderson's account, but the certification purported to authenticate an identifier number, so there was "no nexus shown between the records and the certification." *Id.* at 41. Shields' counsel objected on similar grounds, stating, "I would agree that there is no nexus." *Id.*

[66]   The State responded to each defendant's specific objection, and then generally argued:

Authenticity certified it was providing records "for the account with the identifier 100008034708544." *Ex. Vol. 1* at 176.

[16] Because of the way the trial court conducted the hearing, each attorney only made a specific objection to the introduction of their client's records, but it is clear from context they all objected to the introduction of the records of each defendant.

The inclusion of the vanity name, the inclusion of a screenshot of the exact account record, the images that are contained on that as well as the identifying number of linking both the affidavit and the records. I think that the records have been properly authenticated. I think that the . . . Court can determine that based upon a review of them.

They are what they purport to be. They are reliable, they should be admitted as certified business records.

*Id.* at 50. The trial court admitted the Facebook records of each defendant.

[67] We review a trial court's decision on the admission of evidence only for abuse of discretion. *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021). "We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it and errors affect a party's substantial rights." *Id.*

[68] To properly authenticate a piece of evidence, the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). "Letters and words set down by electronic recording and other forms of data compilation are included within Rule 901(a)." *Wilson v. State*, 30 N.E.3d 1264, 1268 (Ind. Ct. App. 2015), *trans. denied*.

[69] A piece of evidence may be authenticated in a variety of ways, including by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Evid. R.

901(b)(4). Rule 901(b)(4) is "one of the most frequently used means to authenticate electronic data[.]" *Arnett v. Est. of Beavins by Beavins*, 184 N.E.3d 679, 685 (Ind. Ct. App. 2022). Absolute proof of authenticity is not required; instead, an item is admissible if the proponent establishes "a reasonable probability the evidence is what it is claimed to be." *Calvert v. State*, 177 N.E.3d 107, 111 (Ind. Ct. App. 2021), *trans. denied*. Once a reasonable probability is shown, "any inconclusiveness of the evidence's connection with the events at issue goes to evidential weight, not admissibility." *Richardson v. State*, 79 N.E.3d 958, 962 (Ind. Ct. App. 2017), *trans. denied.* Authentication of an exhibit can be established by either direct or circumstantial evidence. *Wisdom v. State*, 162 N.E.3d 489, 494 (Ind. Ct. App. 2020), *trans. denied*.

[70] In cases such as this where the State seeks to establish the author of incriminating textual communications made through social media accounts, evidence of the account's owner is often necessary to authenticate those statements. *Id.* at 494. A proponent can verify a social media account's owner by providing distinctive characteristics unique to the account and the alleged owner. *See Richardson*, 79 N.E.3d at 963; Evid. R. 901(b)(4). In *Richardson*, we held a statement made in Facebook messages was not properly authenticated because the defendant did not present evidence of distinctive characteristics that could connect the Facebook message to the victim nor did he "present any other indicia of reliability establishing [the victim] as the author of the contested statement." 79 N.E.3d at 964.

Shields claims the State failed to adequately authenticate the records because there were no distinctive characteristics connecting the records to the warrants. In other words, Shields argues the State did not establish a reasonable probability the evidence is what it is claimed to be. We disagree—the State did present "other indicia of reliability" sufficient to clear Rule 901(a)'s relatively low hurdle. The URL is a unique identifier in itself. The search warrant for Shields' records included a Facebook case number and the warrant for Anderson's records included a screenshot of the account's homepage, each of which could help Facebook identify the correct account. Detective Smalley testified to the procedure he uses to identify and obtain Facebook records, including submitting a preservation request and referencing that request in a later search warrant.

Moreover, the records themselves establish a reasonable probability the records are what the State claims they are. Shields does not challenge the authentication of Jones' Facebook records. Jones' records were requested and the certificate of authenticity signed before Shields' records were requested. Those records show Jones, with a numeric identifier ending 08544, communicated with Nakeyah Shields, with a numeric identifier ending 03170. *See, e.g.*, *Ex. Vol. 1* at 177. Shields' numeric identifier in Jones' records is the same number as in the Facebook certification of Shields' records. *See id.* at 187. In turn, Shields' records show she communicated with Marcus Anderson, with a numeric identifier ending 46632, the same identifier as in the Facebook certification of Anderson's records. *See id.* at 188, 192. And, coming full circle,

Anderson's records show he communicated with Jones' account, with a numeric identifier ending 08544. The contents of the messages include references to and screenshots of the BOLOs from the Zandy robbery.

[73] The State presented distinctive characteristics linking Shields and Anderson to the Facebook accounts used as evidence at trial. Indisputable proof of account ownership was not required. *See Rogers*, 130 N.E.3d at 629. Any lingering doubts about the authenticity of each account go to the evidentiary weight of the messages, not their admissibility. *See Richardson*, 79 N.E.3d at 963. The trial court's decision to admit this Facebook evidence was not clearly against the logic and effect of the facts and circumstances before it.

## 4. The trial court did not err in denying Shields' request for surrebuttal.

[74] Shields next argues the trial court erred by denying surrebuttal, claiming the State raised a new point or fact in its rebuttal closing argument to which the defendants were entitled to respond.

[75] The Indiana Jury Rules "govern petit jury assembly, selection, and management in all courts of the State of Indiana." Ind. Jury Rule 1 (2003). As to final arguments, the Jury Rules provide:

> If the parties argue the case to the jury, the party with the burden of going forward shall open and close the argument. The party which opens the argument must disclose in the opening all the points relied on in the case. If, in the closing, the party which closes refers to any new point or fact not disclosed in the opening, the adverse party has the right to reply to the new point

or fact. The adverse party's reply then closes the argument in the case.

Jury R. 27 (2007); *see also* I.C. § 35-37-2-2(4) (1985) ("[T]he prosecuting attorney shall disclose in the opening [closing argument] all the points relied on in the case, and if in the closing he refers to any new point or fact not disclosed in the opening, the defendant or his counsel may reply to that point or fact, and that reply shall close the argument of the case."). The trial court has discretion over the conduct of final argument, *Faust v. State*, 344 N.E.2d 296, 299 (Ind. 1976), and the trial court's denial of a request for surrebuttal is reviewed for an abuse of that discretion, *see Jones v. State*, 825 N.E.2d 926, 935 (Ind. Ct. App. 2005), *trans. denied*.

[76] Shields contends the State argued a new point or fact in its rebuttal argument when it specified for the first time the property allegedly stolen from Beaty. The indictment did not allege what property was taken from Beaty. The State did not identify the property during its opening statement. No direct or circumstantial evidence was presented during the State's case-in-chief identifying the property. And during its initial closing argument, the State "made no argument that any property was taken from Beaty . . ., only that Beaty was killed sometime after the robberies of the other victims." *Appellant's Br.* at 38. In its closing argument, the State said:

> We see the escalation that happened during each one of these robberies. Amy Zandy was told you're going to be okay baby girl. She's not hurt. She['s] scared. . . .

> Kim Eggers's, the next one, she gets beat down on the sidewalk. . . . The next one, [Thompson] and them behind the building, they're getting gut kicks and face kicks with shoes as they're lying on the ground[.]
>
> And the next one, Chris Beaty gets beat because the group escalates and then he's killed.

*Tr. Vol. 7* at 106–07.

[77]  Anderson then argued in his closing:[17]

> [T]here's no evidence of any property taken from [Beaty].  His cell phone's north in the alley.  But again, there's no evidence that it was taken from him, that they took it from him.
>
> The evidence is consistent with perhaps there were shots, he ran and fell.  He had his phone in his hand as he started to run, run and fell.  No evidence that anyone struggled with him.

*Id.* at 117–18.  Jones claimed the other victims may have been robbed, but Beaty had been killed, not robbed.  *Id.* at 133 (characterizing the State's argument as "They ran up, they robbed one guy, they robbed [Mitchell] and [Fuentes], they killed Chris Beaty, and they took off, all in this one time, all in this one area.").  Shields argued there was "no evidence whatsoever" Beaty was robbed.  *Id.* at 139.

---

[17] The defendants made their closing arguments in alphabetical order: first Anderson, then Jones, then Shields.

[78] On rebuttal—responding to all three defendants' closing arguments—the State argued:

> Something happened that [Beaty's] phone is not in his hands anymore. Every victim of the robbery at the end of [Talbott Street] said that they were trying to take their phones, standing over them, making them enter their passwords, trying to get into the phone. The phone is at the end of [Talbott Street] and Christopher Beaty has, as Dr. Poulos testified, injuries that are more likely to have come from an altercation than simply falling on the ground.

*Id.* at 149. At the conclusion of the State's rebuttal argument, Jones requested surrebuttal, asserting the State "contended that someone tried to take Christopher Beaty's phone and that its distance from his body was evidence that a robbery occurred. This was not an argument they advanced in their closing." *Id.* at 156. The trial court denied the request but allowed Jones to make a record after the court had given final instructions and the jury began deliberations. Shields and Anderson joined in the request for surrebuttal at that time.

[79] When the State's rebuttal is invited by comments made by defense counsel during closing arguments, the defense has no right to respond. *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (decided under Jury Rule 27); *Goodman v. State*, 588 N.E.2d 507, 508 (Ind. 1992) (decided under I.C. § 35-37-2-2(4)). Shields claims the defendants merely pointed out the lack of evidence supporting the felony murder charge and did not invite the State to argue a new fact on rebuttal.

[80]     In its initial closing argument, the State characterized the crime against Beaty as the "next one" in an escalating string of robberies, a crime spree that ended in Beaty's death. *Tr. Vol. 7* at 107. In response, Shields and Jones generally argued the State failed to prove a robbery or attempted robbery occurred. And Anderson specifically challenged the State's proof of any particular property being taken by force, arguing the evidence was consistent with Beaty dropping his phone as he ran, rather than a forceful taking. Shields contends in her brief that "[i]t was not until [these] argument[s] were made that the State in its final round of closing argued for the first time that the defendants attempted to take Beaty's phone[.]" *Appellant's Br.* at 38–39. She calls this a "last-minute change to the State's case after the close of evidence[.]" *Id.* at 40. But the State had presented to the jury evidence about what property was taken from others, of Beaty's phone being found some distance from his body, and of Beaty's injuries being more consistent with an altercation than with a fall. The State's comments comprised a relatively small portion of its rebuttal, were a response to statements made by defense counsel, and did not argue a new point or fact at the last minute. Rather, they drew the jury's attention to evidence already before it.

[81]     Shields argues the denial of surrebuttal restricted her right to closing argument and her due process right to defend against the State's claim. But to obtain a reversal on appeal, Shields must show the denial affected her substantial rights. *Jones,* 825 N.E.2d at 935 (citing Trial Rule 61 which provides: "The court at every stage of the proceeding must disregard any error or defect in the

proceeding which does not affect the substantial rights of the parties."). Shields offers no analysis of *how* the denial of her request for surrebuttal violated her substantial rights by, for instance, explaining what she would have added had she been granted surrebuttal. The trial court did not abuse its discretion in denying Shields a second closing argument.[18]

## 5. There was no cumulative error.

[82]  Next, Shields argues the cumulative effect of the errors she has alleged denied her a fair trial and warrants reversal even if the errors individually do not. Our Supreme Court has observed:

> This court has been willing to assume "for the sake of argument, that under some circumstances the cumulative effect of trial errors may warrant reversal even if each might be deemed harmless in isolation," but not where it has been "clear in light of the evidence of guilt that no prejudice resulted from any of the erroneous rulings, individually or cumulatively."

*Inman*, 4 N.E.3d at 203 (citing *Hubbell v. State*, 754 N.E.2d 884, 895 (Ind. 2001)). A defendant is "entitled to a fair trial, not a perfect trial." *Id.* (quoting *Myers v. State,* 887 N.E.2d 170, 175 (Ind. Ct. App. 2008), *trans. denied*).

---

[18] Shields acknowledges authority stating review of this issue is waived unless the defendant objects when the State makes the allegedly new point or argument rather than waiting until the State's rebuttal concludes. *See Appellant's Br.* at 39 (citing *Jones*, 825 N.E.2d at 932). But Shields asserts *Jones* was wrongly decided and urges us not to follow it. Because the result is the same whether we follow *Jones* and find the issue waived or consider it on its merits, we decline to address whether *Jones* was wrongly decided.

[83] Shields has presented only one claim of error that has merit—the trial court's failure to admonish the jury after it was sworn but before it broke for a meal as required by statute. Although Shields did not preserve the error by objecting when there was still time for the trial court to correct its omission, such an error does not automatically warrant reversal even when preserved. And Shields did not establish she suffered prejudice to such a degree she was denied a fair trial. We have otherwise found no error in the trial court decisions Shields has challenged and therefore Shields' claim of cumulative error fails.

## 6. Sufficient evidence supports Shields' convictions.

[84] Shields contends there is insufficient evidence to support her conviction of felony murder because the State did not prove the underlying felony of robbery or attempted robbery beyond a reasonable doubt. She also claims there is insufficient evidence she aided in the commission of any of the offenses.

[85] A sufficiency-of-the-evidence claim warrants a "deferential standard of review in which we 'neither reweigh the evidence nor judge witness credibility[.]'" *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (quoting *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *cert. denied*). We apply this deferential standard of review on appeal because a criminal trial is "the main event at which a defendant's rights are to be determined." *Young v. State*, 198 N.E.3d 1172, 1176 (Ind. 2022) (quoting *McFarland v. Scott*, 512 U.S. 849, 859 (1994)).

[86] We respect the jury's primacy to determine whether the State has met its burden of proof, and therefore consider only the evidence most favorable to the verdict

together with all reasonable and logical inferences that may be drawn therefrom. *Id.* A verdict may be sustained on circumstantial evidence alone if that evidence supports a reasonable inference of guilt. *Humphry v. State*, 73 N.E.3d 677, 689 (Ind. 2017). It is not necessary that the circumstantial evidence "overcome every reasonable hypothesis of innocence." *McElfresh v. State*, 51 N.E.3d 103, 110 (Ind. 2016) (quoting *Mills v. State*, 512 N.E.2d 846, 848 (Ind. 1987)). A conviction must be affirmed unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Young*, 198 N.E.3d at 1176 (citation omitted).

## A. There is sufficient evidence Beaty was killed during the commission of an attempted robbery.

[87] "A person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony." I.C. § 35-42-1-1(2). To obtain a conviction of felony murder, the State does not have to prove intent to kill but does have to prove intent to commit the underlying felony—in this case, robbery. *Luna v. State*, 758 N.E.2d 515, 517 (Ind. 2001). A person commits robbery if she knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force on any person or by putting any person in fear. I.C. § 35-42-5-1(a). "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime." I.C. § 35-41-5-1(a).

The State's case against Shields for felony murder relies entirely on circumstantial evidence—there is no direct evidence of what happened between the time Beaty was captured on surveillance video leaving his apartment building and when he was found dead in the street less than ten minutes later. Shields acknowledges a conviction may be supported by inferences drawn from circumstantial evidence. *See Appellant's Br.* at 25. But she emphasizes the inferences must be reasonable—that is, not based on "a mere suspicion, conjecture, conclusion, guess, opportunity, or scintilla." *Id.* at 24 (quoting *Mediate v. State*, 498 N.E.2d 391, 393 (Ind. 1986)). Shields claims the State's argument that "Beaty's phone was found lying on the ground near the end of the alley where the other robberies occurred and Dr. Poulos testified that Beaty's injuries likely came from an altercation instead of falling on the ground" is "nothing more than speculation that Shields or her confederates took or attempted to take Beaty's phone[.]" *Id.* at 27-28.

[89] Our Supreme Court has said:

> In a circumstantial case, no single piece of evidence in isolation—no "smoking gun"—is offered to persuade the jury to convict. Yet a jury may be convinced, beyond a reasonable doubt, by looking at "a web of facts in which no single strand may be dispositive." *Kriner v. State*, 699 N.E.2d 659, 664 (Ind. 1998). Indeed, the "evidence in the aggregate may point to guilt where individual elements of the State's case might not." *Id.*

*Young*, 198 N.E.3d at 1176.

[90] The "web of facts" here includes the group's late arrival downtown after demonstrations had turned "riotous and destructive" and during an "unprecedented . . . volume of runs and reports[.]" *Tr. Vol. 3* at 205, 224. The high-quality video of the Zandy robbery from which Murrell—and ultimately Shields, Anderson, and Jones—were identified as suspects shows the group were all wearing surgical gloves and at least one man was armed.[19] Zandy testified she thought the female was "with that group" but "a little bit removed" when the group was around her car. *Tr. Vol. 5* at 194. Zandy, Eggers, Morris, and Thompson were all robbed of their cellphones, and one of the men had grabbed Bell's cellphone before leaving it behind when he ran away. The group tried to take items from everyone they encountered, although they did not always succeed. Using footage from multiple surveillance cameras, Detective Smalley tracked the suspects as they moved to or near each crime scene, and ballistics evidence tied three of the scenes to each other. Eggers, Morris, and Fuentes identified the men from the BOLOs as the men who robbed them. Zandy identified Anderson in a photo array and at trial as one of her assailants, and Lewis identified one of the men from the BOLOs as Jones.

[91] The suspects robbed multiple people immediately before Beaty was shot and tried to rob Sunkara right after, all in less than twenty minutes and within two blocks. The suspects became increasingly aggressive in their use of force with

---

[19] The men were also wearing masks, which might ordinarily indicate an effort to hide their identity. But as it was the summer of 2020 and COVID-19 mask mandates were still in effect, we do not read anything into this fact.

each robbery. The robberies of Morris, Bell, Thompson, Fuentes, and Mitchell place the suspects on Talbott Street mere minutes before Beaty's body was found, and Shields' admission to interacting with Beaty near the south end of Talbott Street and then hearing gunshots places her in the vicinity. Beaty's cellphone was found toward the north end of Talbott Street, some distance from his body which was facedown pointed to the south—the direction from which he had come. Dr. Poulos identified several blunt force injuries to Beaty's body, and concluded they were more likely than not from a physical altercation.

[92]  In rejecting a defendant's claim that "the evidence necessarily left room for reasonable doubt[,]" our Supreme Court noted it cannot substitute its own "weighing of the evidence for that of the jury. Nor will we divide and conquer the evidence by interpreting each piece individually in the defendant's favor, rather than considering the composite picture and drawing reasonable inferences in support of the verdict." *Young*, 198 N.E.3d at 1178–79. Here, although no direct evidence of the Beaty crime was presented, we cannot say a reasonable jury was unable to draw reasonable inferences from the circumstantial evidence presented to conclude Shields and her co-defendants had a plan to use the chaos downtown on May 30 as cover to rob people. They took cellphones and demanded passwords so they could access them, they employed their fists and feet to hit and kick their victims, and they displayed— and in some cases fired—a weapon to get what they wanted. The evidence in aggregate supports a reasonable inference the group attempted to rob Beaty on Talbott Street by using or threatening use of force.

**B. There is sufficient evidence to support Shields' convictions as an accomplice.**

[93] "A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense[.]" I.C. § 35-41-2-4. A defendant may be charged as the principal but convicted as an accomplice. *Castillo v. State*, 974 N.E.2d 458, 466 (Ind. 2012). Generally, there is no distinction between the liability of an accomplice and a principal, *Wise v. State,* 719 N.E.2d 1192, 1198 (Ind. 1999), as one who aids another in committing a crime is just as guilty as the actual perpetrator, *Madden v. State*, 162 N.E.3d 549, 557 (Ind. Ct. App. 2021). There does not have to be evidence the defendant participated in every element of the underlying offense to convict her as an accomplice. *Castillo*, 974 N.E.2d at 466. Rather, "an accomplice is criminally responsible for all acts committed by a confederate which are a probable and natural consequence" of their concerted action. *McGee v. State*, 699 N.E.2d 264, 265 (Ind. 1998) (citation omitted).

[94] There is no bright line rule for determining accomplice liability; the particular facts and circumstances of each case determine whether a person was an accomplice. *Carter v. State*, 235 N.E.3d 875, 885 (Ind. Ct. App. 2024), *trans. denied*. Mere presence at the scene of a crime alone is not sufficient to allow an inference of accomplice liability. *Ellis v. State*, 67 N.E.3d 643, 650 (Ind. 2017). But "presence at and acquiescence to a crime, along with other facts and circumstances" may be considered. *Vitek v. State,* 750 N.E.2d 346, 352–53 (Ind. 2001). The facts and circumstances that may bear on accomplice liability

include: "(1) presence at the scene of the crime; (2) companionship with another at the scene of the crime; (3) failure to oppose commission of crime; and (4) course of conduct before, during, and after occurrence of crime." *Bruno v. State*, 774 N.E.2d 880, 882 (Ind. 2002).

[95]　Shields parses the circumstances of each crime individually. For instance, she acknowledges her presence at the scene of the Zandy robbery, her companionship with Anderson and Jones, and her failure to oppose the crime, but contends because there is no evidence about her specific conduct during or after the robbery, there is insufficient evidence she aided in the crime. *See Appellant's Br.* at 33–34; *see also id.* at 34–35 (arguing the same with respect to the Eggers robbery). As for the robberies of Morris, Thompson, Bell, Fuentes, and Mitchell, Shields argues there is no evidence she was present, as none of the victims identified a woman among the perpetrators. She concedes an inference could be made of her companionship with her co-defendants but argues there is no evidence she failed to oppose the crimes and no evidence of her conduct before, during, or after the robberies. *See id.* at 32–33. As to felony murder, she concedes her "prior presence at the location where Beaty was found," her interaction with him in the moments before he was shot, and her companionship with her co-defendants, but argues there is no evidence of what occurred before or at the time Beaty was shot. *Id.* at 29.

[96]　Given the circumstances of this case—where so many crimes occurred in such a short time—we do not believe each crime should be considered in isolation. Instead, when we look at the probative evidence of the entire episode most

favorable to the verdicts, we conclude a reasonable jury could find Shields guilty as an accomplice beyond a reasonable doubt.

[97] Shields was present at the Zandy and Eggers robbery scenes, as she could be seen on surveillance videos. She was also present in and around the block where the other crimes occurred. The State's evidence plainly demonstrates Shields' companionship with Anderson, Jones, Murrell, and the unidentified man during the crimes. She concedes she failed to oppose the Zandy and Eggers robberies, and it can be reasonably inferred she did not oppose the other robberies given her continued companionship with the men after those crimes.

[98] In addition, Shields' conduct before, during, and after the crimes supports an inference of guilt. She traveled downtown with her boyfriend, Murrell, and Anderson late at night in the midst of civil unrest and met up with Jones and the unidentified man once there. She put on surgical gloves to walk around the city streets in May. During the Zandy robbery, she put her hood up, pulled it tight around her face, looked in the car window, and seemingly smiled as she walked away, passing Jones and Murrell as they approached the car with a gun. Detective Smalley tracked the group around the area after they left the parking garage, and they were near each other for the twenty minutes these crimes were occurring. By Shields' own account, after she interacted with Beaty, she heard gunshots and ran away. But she soon rejoined the group. She stayed with the group for several more hours, as they were all together when Murrell was shot. At some point, Shields took off her distinctive jacket. And in the days after the

crimes, she, Anderson, and Jones shared messages indicating a consciousness of guilt.[20]

[99] Even though Beaty's murder may not have been part of the original purpose for going downtown, Shields is liable as an accomplice for everything that followed incidentally as a natural and probable consequence of the endeavor. *See Pugh v. State*, 52 N.E.3d 955, 968 (Ind. Ct. App. 2016) (affirming defendant's convictions of rape and attempted criminal deviate conduct as an accomplice even though he did not commit any sexual acts because sexual violence was a natural and probable consequence of an alcohol- and drug-fueled invasion of a home by six men where women were present), *trans. denied*.

[100] We conclude a reasonable jury could find Shields guilty as an accomplice of felony murder and robbery.

## 7. Shields' sentence is not inappropriate.

[101] Finally, Shields asks us to revise her sentence. The Indiana Constitution authorizes this Court to review and revise a trial court's sentencing decision as provided by rule. Ind. Const. art. 7, § 6. Indiana Appellate Rule 7(B) provides we may revise a sentence authorized by statute if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in

---

[20] Shields refers back to her argument that these messages were admitted in error and should not be considered in evaluating her conduct after the crimes. *See Appellant's Br.* at 29. As discussed above, the trial court did not err in admitting these messages. *See supra* ¶ 73.

light of the nature of the offense and the character of the offender." The principal role of appellate review is to leaven the outliers, not to achieve a perceived correct sentence in each case. *Conley v. State*, 183 N.E.3d 276, 288 (Ind. 2022). Therefore, "we reserve our 7(B) authority for exceptional cases." *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019) (per curiam).

[102] "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The two prongs of 7(B) review are "separate inquiries to ultimately be balanced in determining whether a sentence is inappropriate." *Lane v. State*, 232 N.E.3d 119, 126 (Ind. 2024) (quoting *Conner v. State*, 58 N.E.3d 215, 218 (Ind. Ct. App. 2016)). "[T]o the extent the evidence on one prong militates against relief, a claim based on the other prong must be all the stronger to justify relief." *Id.* at 127.

[103] The question "is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate." *Helsley v. State*, 43 N.E.3d 225, 228 (Ind. 2015) (quoting *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)) (emphasis omitted). Whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the

severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. The defendant bears the burden of persuading us a revised sentence is warranted. *See Hall*, 177 N.E.3d at 1197.

[104] Shields was convicted of felony murder—which carries a sentencing range of forty-five to sixty-five years, with an advisory term of fifty-five years—and seven Level 3 felonies—which each carry a sentencing range of three to sixteen years, with an advisory sentence of nine years. I.C. §§ 35-50-2-3, -5(b). The trial court sentenced Shields to fifty-two years for felony murder, eight years for each robbery and attempted robbery conviction, and ordered the sentences to be served consecutively, for a total sentence of 108 years. The individual sentences were below the advisory.

[105] Because our legislature has selected the advisory sentence as the "starting point" for "an appropriate sentence for the crime committed," the defendant bears a "particularly heavy burden" when the trial court imposes the advisory sentence. *Fernbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011), *trans. denied*. Shields has not met that heavy burden.

[106] As for the nature of the offenses, the State aptly characterizes them as occurring "on a night when law enforcement was least likely to be able to stop them[.]" *Appellee's Br.* at 52. After Zandy was robbed, she saw an occupied police car and stopped to make a report. Zandy said "it was very chaotic. There was gunshots. There was people running around. It – it was very chaotic." *Tr. Vol.*

*5* at 187. The officer took her name and number and said someone would contact her but sent her on her way because it was not safe for him to be out of his car. That summarizes the environment into which Shields and her companions willingly entered, wearing gloves, carrying at least one weapon, and—as shown by the men trying random car doors in the Zandy parking garage—looking to take advantage. And they did seize on "nine victims in 15 minutes." *Tr. Vol. 8* at 86.[21] The trial court rejected Shields' contention that she was just in the wrong place at the wrong time. Several people—who were already "freak[ed] out" by the atmosphere downtown— were robbed of their property and Beaty was robbed of his life. *Tr. Vol. 4* at 210.

[107] As for her character, Shields highlights several admirable traits: that she was known to her family and friends as "someone who cared for everyone," worked as a caregiver for those who were in assisted living or needed in-home care, and had not committed a criminal offense in her adult life. *Appellant's Br.* at 49. She also highlights her struggles: she began using marijuana when she was fifteen and drinking alcohol when she was seventeen; she is the single mother of a young son; and she has been diagnosed with anxiety, depression, and PTSD. But Shields had contact with the juvenile justice system and several disciplinary incidents since her arrest in this case. It is unclear when Shields was first diagnosed with anxiety, but she was not diagnosed with depression or PTSD

---

[21] The trial court made this statement in sentencing Shields, although Shields was only charged with and convicted of crimes against eight victims. There were nine total victims during the episode, however, and Shields does not argue this misstatement affected her sentence.

until after her arrest and she makes no argument that her participation in these crimes was related to her mental health diagnoses. Her son was very young when she committed these offenses.

[108] Shields' argument, however, is focused more on the trial court's decision to impose consecutive sentences; she advocates for a sentence of fifty-two years— the same terms of years but served concurrently. She argues concurrent terms would be "more appropriate" because her crimes were compressed in time, constituted her first criminal offenses, and would allow her to have a life with her son outside of prison. *Id.* at 50. But we do not consider whether another sentence might be "more appropriate." *Helsley*, 43 N.E.3d at 228. And we have long recognized that "[c]onsecutive sentences reflect the significance of multiple victims." *Pittman v. State,* 885 N.E.2d 1246, 1259 (Ind. 2008) (citing *McCann v. State,* 749 N.E.2d 1116, 1120 (Ind. 2001)). Here, there were eight victims, each of whom suffered a loss—of property, peace of mind, or life. Thus, we cannot say that the trial court's decision to impose consecutive, below-advisory sentences was inappropriate.

## Conclusion

[109] The trial court should have admonished the jury before it released them for lunch, but did not commit fundamental error in failing to do so. The trial court did not err as to any other issue raised by Shields and there is no cumulative error. Sufficient evidence supports Shields' convictions, and her sentence is not inappropriate.

Affirmed.

May, J., and Vaidik, J., concur.

ATTORNEY FOR APPELLANT

Talisha Griffin
Marion County Public Defender Agency
Indianapolis, Indiana


ATTORNEY FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana